UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION
www.flmb.uscourts.gov

IN RE:                                        Case No. 8:19-bk-01847-CPM
Jason Jeffrey Rockenbach,                     Chapter 7

_____ Debtor. _____/

## MOTION FOR RELIEF FROM THE AUTOMATIC STAY
## (RE: 1004 EAST IDA STREET, TAMPA, FL 33603)

### NOTICE OF OPPORTUNITY TO OBJECT AND FOR HEARING

**Pursuant to Local Rule 2002-4, the Court will consider the relief requested in this paper without further notice or hearing unless a party in interest files a response within twenty-one (21) days from the date set forth on the attached proof of service, plus an additional three days for service if any party was served by U.S. Mail.**

**If you object to the relief requested in this paper, you must file a response with the Clerk of the Court at Sam M. Gibbons United States Courthouse, 801 N. Florida Avenue, Suite 555, Tampa, FL 33602, and serve a copy on the movant's attorney, Lindsey Savastano, c/o SHAPIRO, FISHMAN & GACHÉ, 2424 NORTH FEDERAL HIGHWAY, SUITE 360, BOCA RATON, FLORIDA 33431, and any other appropriate person's within the time allowed. If you file and serve a response within the time permitted, the Court will either schedule and notify you of a hearing, or consider the response and grant or deny the relief requested without a hearing.**

**If you do not file a response within the time permitted, the Court will consider that you do not oppose the relief requested in the paper, will proceed to consider the paper without further notice or hearing, and may grant the relief requested.**

COMES NOW, Secured Creditor, U.S. Bank National Association, Successor Trustee to Bank of America, N.A. as Successor to LaSalle Bank, N.A. as Trustee, for Merrill Lynch First Franklin Mortgage Loan Trust, Mortgage Loan Asset-Backed Certificates, Series 2007-3, by and through its undersigned attorneys, moves the Court for an Order Granting Relief from the Automatic Stay pursuant to 11 USC 362(d)(1) and 11 USC 362(d)(2)(A) and in support thereof would show:

1.      This is a Motion pursuant to Bankruptcy Rule 4001(a) for Relief from the automatic stay provisions of Section 362(a) of the Bankruptcy Code.

2.      Debtor filed this case on March 5, 2019.

3.      U.S. Bank National Association, Successor Trustee to Bank of America, N.A. as Successor to LaSalle Bank, N.A. as Trustee, for Merrill Lynch First Franklin Mortgage Loan Trust, Mortgage Loan Asset-Backed Certificates, Series 2007-3, is a secured creditor by virtue of a promissory Note and Mortgage on real property, attached hereto as **Exhibit "A"**.  Said real property has the following legal description:

> THE SOUTH 90 FEET OF LOT 14, PIERCE SUBDIVISION, AS PER PLAT THEREOF, RECORDED IN PLAT BOOK 9, PAGE 70, OF THE PUBLIC RECORDS OF HILLSBOROUGH COUNTY, FLORIDA.

The common address is: 1004 East Ida Street, Tampa, FL 33603 (the "Property").

4.      The Property has not been claimed exempt by Debtor and has not been abandoned by the Trustee.

5.      The payments due pursuant to the aforementioned Note and Mortgage have been in default, and remain in default, since February 1, 2019.

6.      As of March 25, 2019, the approximate value of debt due is $173,101.74.

7.      Debtor has failed to adequately protect the interest of Secured Creditor, U.S. Bank National Association, Successor Trustee to Bank of America, N.A. as Successor to LaSalle Bank, N.A. as Trustee, for Merrill Lynch First Franklin Mortgage Loan Trust, Mortgage Loan Asset-Backed Certificates, Series 2007-3.

8.      The Hillsborough County Property Appraiser's website for the Property reflects a market value of $84,800.00. A copy of the valuation is attached as **Exhibit "B"**.

9.      There is no equity in the Property.

19-319119 BK01

10.     Secured Creditor, U.S. Bank National Association, Successor Trustee to Bank of America, N.A. as Successor to LaSalle Bank, N.A. as Trustee, for Merrill Lynch First Franklin Mortgage Loan Trust, Mortgage Loan Asset-Backed Certificates, Series 2007-3, is prohibited from initiating a foreclosure in the State Court because of the pendency of this bankruptcy action and, in the absence of the Court's order allowing Secured Creditor to initiate a foreclosure action, the Secured Creditor's security interest will be significantly jeopardized.

11.     Secured Creditor, U.S. Bank National Association, Successor Trustee to Bank of America, N.A. as Successor to LaSalle Bank, N.A. as Trustee, for Merrill Lynch First Franklin Mortgage Loan Trust, Mortgage Loan Asset-Backed Certificates, Series 2007-3, also seeks relief to consider Debtor for any short sale or deed in lieu of foreclosure as alternatives to proceeding with a judicial foreclosure action.

12.     Once the stay is terminated, Debtor will have minimal incentive to insure, preserve, or protect the Property; therefore, Secured Creditor, U.S. Bank National Association, Successor Trustee to Bank of America, N.A. as Successor to LaSalle Bank, N.A. as Trustee, for Merrill Lynch First Franklin Mortgage Loan Trust, Mortgage Loan Asset-Backed Certificates, Series 2007-3, requests that the Court waive the 14-day stay period imposed by Fed.R.Bankr.P. 4001(a)(3).

13.     This Motion seeks *in rem* relief only and does not seek *in personam* relief against Debtors.

14.     Pursuant to M.D. Fla. L.B.R. 9004-2(f) the estimated time required for hearing is five (5) minutes.

WHEREFORE, Secured Creditor, U.S. Bank National Association, Successor Trustee to Bank of America, N.A. as Successor to LaSalle Bank, N.A. as Trustee, for Merrill Lynch First Franklin Mortgage Loan Trust, Mortgage Loan Asset-Backed Certificates, Series 2007-3, moves this Honorable Court for an Order granting relief from the automatic stay and waiver of the 14-day stay imposed by Fed.R.Bankr.P. 4001(a)(3).

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing has been sent via CM/ECF electronic filing or via first class U.S. Mail to the following on this 5TH day of April, 2019.

Jason Jeffrey Rockenbach, 10126 Somersby Drive, Riverview, FL 33578
Robert M Geller, 807 West Azeele Street, Tampa, FL 33606
Carolyn R. Chaney, P.O. Box 530248, St Petersburg, FL 33747
United States Trustee, 501 E. Polk Street, Suite 1200, Tampa, FL 33602

/s/ Lindsey Savastano
Lindsey Savastano
FL Bar # 57079
Shapiro, Fishman & Gaché, LLP
Attorney for Secured Creditor
2424 North Federal Highway
Suite 360
Boca Raton, Florida 33431
Telephone: 561-542-7621
Fax: (561) 998-6707
E-mail: Lsavastano@LOGS.com

19-319119 BK01

Copy



# ADJUSTABLE RATE NOTE
### (LIBOR 6 Month Index (As Published In the Wall Street Journal)-Rate Caps)

---

**THIS NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE AND MY MONTHLY PAYMENT. THIS NOTE LIMITS THE AMOUNT MY INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE I MUST PAY.**

March 28, 2007                          Brandon                          Florida
[Date]                                  [City]                           [State]

1004 E IDA ST
TAMPA, FL  33603

[Property Address]

## 1.  BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $ 176,000.00                    (this amount is called "principal"), plus interest, to the order of the Lender. The Lender is
FIRST FRANKLIN FINANCIAL CORP., AN OP. SUB. OF MLB&T CO., FSB                                    .
I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2.  INTEREST

Interest will be charged on unpaid principal until the full amount of principal has been paid. I will pay interest at a yearly rate of          8.6500%. The interest rate I will pay may change in accordance with Section 4 of this Note.

The interest rate required by this Section 2 and Section 4 of this Note is the rate I will pay both before and after any default described in Section 7(B) of this Note.

## 3.  PAYMENTS

### (A)  Time and Place of Payments

I will pay principal and interest by making payments every month.

I will make my monthly payments on the first day of each month beginning on          May 01, 2007          .
I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. My monthly payments will be applied to interest before principal. If, on
April 01, 2037          , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at 150 ALLEGHENY CENTER MALL, PITTSBURGH, PA  15212



or at a different place if required by the Note Holder.

### (B)  Amount of My Initial Monthly Payments

Each of my initial monthly payments will be in the amount of U.S. $ 1,285.95          . This amount may change.

### (C)  Monthly Payment Changes

Changes in my monthly payment will reflect changes in the unpaid principal of my loan and in the interest rate that I must pay. The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Section 4 of this Note.

FLORIDA ADJUSTABLE RATE NOTE - LIBOR 6 MONTH INDEX (AS PUBLISHED IN THE WALL STREET JOURNAL) --
Single Family

1386          GREATLAND ■
To Order Call: 1-800-530-9393 □Fax 616-791-1131

EXHIBIT A

Copy

## 4. INTEREST RATE AND MONTHLY PAYMENT CHANGES

### (A) Change Dates

The interest rate I will pay may change on the first day of April 2009 , and on that day every 6 month thereafter. Each date on which my interest rate could change is called a "Change Date."

### (B) The Index

Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is the average of interbank offered rates for 6 month U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in *The Wall Street Journal*. The most recent Index figure available as of the first business day of the month immediately preceding the month in which the Change Date occurs is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

### (C) Calculation of Changes

Before each Change Date, the Note Holder will calculate my new interest rate by adding Five and Nine Tenths percentage points ( 5.9000%) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

### (D) Limits on Interest Rate Changes

The interest rate I am required to pay at the first Change Date will not be greater than 11.6500% or less than 8.6500%. Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than One percentage point(s) ( 1.0000%) from the rate of interest I have been paying for the preceding 6 months; subject to the following limits: My interest rate will never be greater than 14.6500%, nor less than 8.6500%.

### (E) Effective Date of Changes

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

### (F) Notice of Changes

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given me and also the telephone number of a person who will answer any question I may have regarding the notice.

## 5. BORROWER'S RIGHT TO PREPAY **

I have the right to make payments of principal at any time before they are due. A payment of principal only is known as a "prepayment." When I make a prepayment, I will tell the Note Holder in writing that I am doing so.

I may make a full prepayment or partial prepayments without paying any prepayment charge. The Note Holder will use all of my prepayments to reduce the amount of principal that I owe under this Note. If I make a partial prepayment, there will be no changes in the due dates of my monthly payments unless the Note Holder agrees in writing to those changes. My partial prepayment may reduce the amount of my monthly payments after the first Change Date following my partial prepayment. However, any reduction due to my partial prepayment may be offset by an interest rate increase.

## 6. LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (i) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (ii) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the principal I owe under this Note or by making a direct payment to me. If a refund reduces principal, the reduction will be treated as a partial prepayment.

1386     GREATLAND ■
To Order Call: 1-800-530-9393 □Fax 616-791-1131

EXHIBIT A

Copy

  

**7. BORROWER'S FAILURE TO PAY AS REQUIRED**

**(A) Late Charges for Overdue Payments**

If the Note Holder has not received the full amount of any monthly payment by the end of          Fifteen          calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be          5.0000 % of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

**(B) Default**

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

**(C) Notice of Default**

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of principal that has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is delivered or mailed to me.

**(D) No Waiver By Note Holder**

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

**(E) Payment of Note Holder's Costs and Expenses**

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

**8. GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Unless the Note Holder requires a different method, any notice that must be given to the Note Holder under this Note will be given by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

**9. OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

**10. WAIVERS**

I and any other person who has obligations under this Note waive the rights of presentment and notice of dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

**11. UNIFORM SECURED NOTE**

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises that I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** If all or any part of the Property or any interest in it is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if exercise is prohibited by federal law as of the date of this Security Instrument. Lender also shall not exercise this option if:

386          GREATLAND ■
To Order Call: 1-800-530-9393 □Fax 616-791-1131

EXHIBIT A

Copy

(a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by applicable law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

## 12. DOCUMENTARY TAX

The state documentary tax due on this Note has been paid on the mortgage securing this indebtedness.

Borrower has executed and acknowledges receipt of pages 1 through 4 of this Note.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ (Seal)          _____ (Seal)
JASON ROCKENBACH                       -Borrower                                          -Borrower

_____ (Seal)          _____ (Seal)
                                                -Borrower                                          -Borrower

_____ (Seal)          _____ (Seal)
                                                -Borrower                                          -Borrower

*[Sign Original Only]*

** 

**THE PREPAYMENT NOTE ADDENDUM ATTACHED HERETO AND MADE A PART HEREOF**
**AMENDS THE PREPAYMENT PROVISIONS OF THIS NOTE**

_____ _____ _____ _____ _____ _____
Initials  Initials  Initials  Initials  Initials  Initials

Pay to the order of:
First Franklin Financial Corporation
Without Recourse
First Franklin Financial Corp.
an Op. Sub. of MLB&T Co., FSB
By: _____
Faith Norris
Sr. Funder

Pay to the order of:
_____
Without Recourse
First Franklin Financial Corporation
By: _____
Faith Norris
Sr. Funder

*(Page 4 of 4 pages)*     1386    GREATLAND ■
To Order Call: 1-800-530-9393 □Fax 616-791-1131

EXHIBIT A

Copy

# PREPAYMENT NOTE ADDENDUM

This Prepayment Note Addendum is made this    28th    day of        March 2007        .
and is incorporated into and shall be deemed to amend and supplement the Note of the same date (the "Note") given
by the undersigned (the "Borrower") to evidence Borrower's indebtedness to
FIRST FRANKLIN FINANCIAL CORP., AN OP. SUB. OF MLB&T CO., FSB
(the "Lender"), which indebtedness is secured by a Mortgage, Deed of Trust or Security Deed (the "Security
Instrument"), of the same date and covering the property described in the Security Instrument and located at:

1004 E IDA ST<br>TAMPA, FL  33603

**ADDITIONAL COVENANTS.**    Notwithstanding anything to the contrary set forth in the Note or Security
Instrument, Borrower and Lender further covenant and agree as follows:

1.   Section 5 of the Adjustable Rate Note, is modified to provide for a prepayment charge upon Borrower's full
prepayment.   A "full prepayment" is the prepayment of all of the unpaid principal due under the Note.   A
prepayment of only part of the unpaid principal is known as a "partial prepayment."

Borrower can make a partial prepayment at anytime without paying any charge.   Borrower may make a full
prepayment at anytime subject to a prepayment charge as follows:

If within the first   12   months after the date Borrower executes the Note, Borrower makes a full prepayment
(including prepayments occurring as a result of the acceleration of the maturity of the Note), Borrower must, as a
condition precedent to a full prepayment, pay a prepayment charge on any amount prepaid in any 12 month period
in excess of 20% of the unpaid balance.   The prepayment charge will equal the interest that would accrue during a
six-month period on the Excess Principal calculated at the rate of interest in effect under the terms of the Note at the
time of the full prepayment.

2.   All other provisions of the Note are unchanged by this addendum and remain in full force and effect.

<strong>NOTICE TO BORROWER</strong>

**Do not sign this loan agreement before you read it.  This loan agreement provides for the payment of a
penalty if you wish to repay the loan prior to the date provided for repayment in the loan agreement.**

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in the Prepayment
Note Addendum.

_____ (Seal)          _____ (Seal)
JASON ROCKENBACH              -Borrower                                    -Borrower

_____ (Seal)          _____ (Seal)
                              -Borrower                                    -Borrower

_____ (Seal)          _____ (Seal)
                              -Borrower                                    -Borrower

Adjustable Rate Prepayment Note Addendum - First Lien – AK, AL, AZ, CA, CO, CT, DC, DE, FL, GA, HI, IA, ID, KS, LA, MA, MD,
MN, MT, ND, NE, NH, NJ, NM, NV, NY, OK, OR, PA, RI, SC, SD, TN, TX, UT, VA, VT, WA, WY

1386

EXHIBIT A

Copy

# BALLOON NOTE ADDENDUM
# TO ADJUSTABLE RATE NOTE

(Index: Six-Month London Interbank Offered Rate ("LIBOR") As Published in *The Wall St. Journal* – Rate Caps)
(Amortization Period:   Fifty   Years)
(Not to be Used for Texas Homestead Loans Unless Proceeds Used Only for Purchase Money or Refinance of Purchase Money)

THIS LOAN IS PAYABLE IN FULL ON THE MATURITY DATE SET FORTH IN THE NOTE. YOU MUST REPAY THE ENTIRE PRINCIPAL BALANCE OF THE LOAN, UNPAID INTEREST AND OTHER SUMS THEN DUE. THE LENDER IS UNDER NO OBLIGATION TO REFINANCE THE LOAN AT THAT TIME. YOU WILL, THEREFORE, BE REQUIRED TO MAKE PAYMENT OUT OF OTHER ASSETS THAT YOU MAY OWN, OR YOU WILL HAVE TO FIND A LENDER, WHICH MAY BE THE LENDER YOU HAVE THIS LOAN WITH, WILLING TO LEND YOU THE MONEY. IF YOU REFINANCE THIS LOAN AT MATURITY, YOU MAY HAVE TO PAY SOME OR ALL OF THE CLOSING COSTS NORMALLY ASSOCIATED WITH A NEW LOAN EVEN IF YOU OBTAIN REFINANCING FROM THE SAME LENDER.

This Balloon Note Addendum to Adjustable Rate Note (this "Addendum") is made this    28th    day of         March ,2007         and is incorporated into and shall be deemed to amend and supplement the Adjustable Rate Note of the same date (the "Note") and any other Addenda to the Note given by the undersigned (the "Borrower") to evidence Borrower's indebtedness to
FIRST FRANKLIN FINANCIAL CORP., AN OP. SUB. OF MLB&T CO., FSB
(the "Lender"), which indebtedness is secured by a Mortgage, Deed of Trust or Security Deed (the "Security Instrument"), of the same date and covering the property described in the Security Instrument and located at:
1004 E IDA ST
TAMPA, FL 33603

ADDITIONAL COVENANTS:    Unless specifically defined in this Addendum, any capitalized terms shall have the same meaning as in the Note. Notwithstanding anything to the contrary set forth in the Note, Addenda to the Note or Security Instrument, Borrower further covenants and agrees as follows:

1. The initial monthly payments under Note are calculated using a  Fifty    50  ) year amortization period. Monthly payments after the first Change Date will be calculated using a   Fifty    (50   ) year amortization period. The remaining unpaid principal balance is due on the Maturity Date. Section 4(C) of the Note is hereby restated as follows:

4.    INTEREST RATE AND MONTHLY PAYMENT CHANGES

(A)    Change Dates

(See Note)

(B)    The Index

(See Note)

Balloon Note Addendum to Adjustable Rate Note

EXHIBIT A

Copy

**(C) Calculation of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding Five and Nine Tenths percentage point(s) (     5.9000%) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full   Fifty    ( 50    ) years after the date of the Note at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment. I will pay the remaining unpaid principal balance on the Maturity Date.

**(D)    Limits on Interest Rate Changes**

(See Note)

**(E)    Effective Date of Changes**

(See Note)

**(F)    Notice of Changes**

(See Note)

II.     All other provisions of the Note and other Addenda to the Note are unchanged by this Addendum and remain in full force and effect.

By signing below, Borrower accepts and agrees to the terms and conditions contained in this Balloon Note Addendum to Adjustable Rate Note.

_____(Seal)       _____(Seal)
Borrower JASON ROCKENBACH            Borrower

_____(Seal)       _____(Seal)
Borrower                           Borrower

_____(Seal)       _____(Seal)
Borrower                           Borrower

I understand that the final payment under this Note includes a substantial payment of principal.

_____(Seal)       _____(Seal)
Borrower JASON ROCKENBACH            Borrower

_____(Seal)       _____(Seal)
Borrower                           Borrower

_____(Seal)       _____(Seal)
Borrower                           Borrower

████ 1386
Balloon Note Addendum to Adjustable Rate Note

EXHIBIT A

Copy

PREPARED BY:

Name: DENISE MORSE

Address: FIRST FRANKLIN FINANCIAL CORP.
3000 BAYPORT DRIVE, STE 250, TAMPA, FL
33607

Return to:

FIRST FRANKLIN FINANCIAL CORP.
c/o SECURITY CONNECTIONS
895 UNIVERSITY BLVD, DEPT 2150
IDAHO FALLS, ID 83401 **GENESIS TITLE COMPANY**
**2119 W. BRANDON BLVD. STE. E.**
**BRANDON, FL 33511-4731**

INSTRUMENT#: 2007162554, O BK 17636
PG 1677-1695  04/05/2007 at 10:46:52 AM,
DOC TAX PD(F.S.201.08) $616.00 INT.TAX PD
(F.S.199) $352.00 DEPUTY CLERK: SEDSON
Pat Frank, Clerk of the Circuit Court
Hillsborough County

[Space Above This Line For Recording Data]

# MORTGAGE

MIN: ████████3868

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

**(A)** **"Security Instrument"** means this document, which is dated March 28, 2007 , together with all Riders to this document.

**(B)** **"Borrower"** is JASON ROCKENBACH, A MARRIED MAN

Borrower is the mortgagor under this Security Instrument.

**(C)** **"MERS"** is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. **MERS is the mortgagee under this Security Instrument.** MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.

**(D)** **"Lender"** is FIRST FRANKLIN FINANCIAL CORP., AN OP. SUB. OF MLB&T CO., FSB
Lender is a Corporation                                                                organized and existing under
the laws of Delaware                                                               . Lender's address is
2150 NORTH FIRST STREET, SAN JOSE, California  95131

**(E)** **"Note"** means the promissory note signed by Borrower and dated March 28, 2007 . The Note states that Borrower owes Lender One Hundred Seventy Six Thousand and no/100
Dollars (U.S. $176,000.00 ) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than April 01, 2037.

**(F)** **"Property"** means the property that is described below under the heading "Transfer of Rights in the Property."

FLORIDA—Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT                          Form 3010 1/01

(Page 1 of 12 pages)                          1386  GreatDocs™
To Order Call: 1-800-968-5775

EXHIBIT A

Copy

**(G)** **"Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

**(H)** **"Riders"** means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

| | | |
|---|---|---|
| [X] Adjustable Rate Rider | [ ] Condominium Rider | [ ] Second Home Rider |
| [X] Balloon Rider | [ ] Planned Unit Development Rider | [X] Other(s) [specify] Prepay Rider |
| [X] 1-4 Family Rider | [ ] Biweekly Payment Rider | |

**(I)** **"Applicable Law"** means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

**(J)** **"Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

**(K)** **"Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

**(L)** **"Escrow Items"** means those items that are described in Section 3.

**(M)** **"Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

**(N)** **"Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on, the Loan.

**(O)** **"Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

**(P)** **"RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

**(Q)** **"Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

EXHIBIT A

Copy

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, grant and convey to MERS (solely as nominee for Lender and Lender's successors and assigns) and to the successors and assigns of MERS, the following described property located in the
COUNTY                               of                          HILLSBOROUGH                          :
[Type of Recording Jurisdiction]                              [Name of Recording Jurisdiction]

THE SOUTH 90 FEET OF LOT 14, PIERCE SUBDIVISION, AS PER PLAT THEREOF, RECORDED IN PLAT BOOK 9, PAGE 70, OF THE PUBLIC RECORDS OF HILLSBOROUGH COUNTY, FLORIDA.

which currently has the address of                              1004 E IDA ST
                                                                [Street]

        TAMPA                 , Florida            33603              ("Property Address"):
        [City]                                   [Zip Code]

    TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

    BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

    THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

    UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:
    1.    **Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

FLORIDA—Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT                                    Form 3010 1/01

386  GreatDocs ™
To Order Call: 1-800-968-5775

EXHIBIT A

Copy

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

    **2.   Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

    If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

    Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

    **3.   Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

    Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

    The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for

EXHIBIT A

Copy

holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4.   **Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5.   **Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not

EXHIBIT A

Copy

otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

      6.    **Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

      7.    **Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

      8.    **Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

      9.    **Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument,

EXHIBIT A

Copy

including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a)  Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b)  Any such agreements will not affect the rights Borrower has—if any—with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

FLORIDA—Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT

Form 3010 1/01

1386  GreatDocs™
To Order Call: 1-800-968-5775

EXHIBIT A

Copy

**11. Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument

EXHIBIT A

Copy

but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may

EXHIBIT A

Copy

require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental

EXHIBIT A

Copy

Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument, foreclosure by judicial proceeding and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to assert in the foreclosure proceeding the non-existence of a default or any other defense of Borrower to acceleration and foreclosure. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may foreclose this Security Instrument by judicial proceeding. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.**

**23. Release.** Upon payment of all sums secured by this Security Instrument, Lender shall release this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

**24. Attorneys' Fees.** As used in this Security Instrument and the Note, attorneys' fees shall include those awarded by an appellate court and any attorneys' fees incurred in a bankruptcy proceeding.

**25. Jury Trial Waiver.** The Borrower hereby waives any right to a trial by jury in any action, proceeding, claim, or counterclaim, whether in contract or tort, at law or in equity, arising out of or in any way related to this Security Instrument or the Note.

EXHIBIT A

Copy

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in pages 1 through 12 of this Security Instrument and in any rider(s) executed by Borrower and recorded with it.

_____ (Seal)          _____ (Seal)
JASON ROCKENBACH                     -Borrower                                                     -Borrower
10005 REMINGTON DR
RIVERVIEW, FL 33569

_____ (Seal)          _____ (Seal)
                                                 -Borrower                                                     -Borrower

_____ (Seal)          _____ (Seal)
                                                 -Borrower                                                     -Borrower

State of Florida
County of Hillsborough

The foregoing instrument was acknowledged before me this 28 day of March 2007 by
JASON ROCKENBACH

who is personally known to me or who has produced valid driver's license

as identification.

_____
Notary Public

Joseph Martillo
My Commission DD304022
Expires March 25, 2003

FLORIDA—Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT                    Form 3010 1/01
                                                                                                                1386 GreatDocs™
                                    (Page 12 of 12 pages)                                  To Order Call 1-800-968-5775

EXHIBIT A

Copy

# 1-4 FAMILY RIDER
### (Assignment of Rents)

THIS 1-4 FAMILY RIDER is made this      28th      day of         March 2007         . and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure Borrower's Note to FIRST FRANKLIN FINANCIAL CORP., AN OP. SUB. OF MLB&T CO., FSB

(the "Lender") of the same date and covering the Property described in the Security Instrument and located at:

1004 E IDA ST
TAMPA, FL  33603

[Property Address]

**1-4 FAMILY COVENANTS.** In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

**A. ADDITIONAL PROPERTY SUBJECT TO THE SECURITY INSTRUMENT.** In addition to the Property described in Security Instrument, the following items now or hereafter attached to the Property to the extent they are fixtures are added to the Property description, and shall also constitute the Property covered by the Security Instrument: building materials, appliances and goods of every nature whatsoever now or hereafter located in, on, or used, or intended to be used in connection with the Property, including, but not limited to, those for the purposes of supplying or distributing heating, cooling, electricity, gas, water, air and light, fire prevention and extinguishing apparatus, security and access control apparatus, plumbing, bath tubs, water heaters, water closets, sinks, ranges, stoves, refrigerators, dishwashers, disposals, washers, dryers, awnings, storm windows, storm doors, screens, blinds, shades, curtains and curtain rods, attached mirrors, cabinets, paneling and attached floor coverings, all of which, including replacements and additions thereto, shall be deemed to be and remain a part of the Property covered by the Security Instrument. All of the foregoing together with the Property described in the Security Instrument (or the leasehold estate if the Security Instrument is on a leasehold) are referred to in this 1-4 Family Rider and the Security Instrument as the "Property."

**B. USE OF PROPERTY; COMPLIANCE WITH LAW.** Borrower shall not seek, agree to or make a change in the use of the Property or its zoning classification, unless Lender has agreed in writing to the change. Borrower shall comply with all laws, ordinances, regulations and requirements of any governmental body applicable to the Property.

**C. SUBORDINATE LIENS.** Except as permitted by federal law, Borrower shall not allow any lien inferior to the Security Instrument to be perfected against the Property without Lender's prior written permission.

**D. RENT LOSS INSURANCE.** Borrower shall maintain insurance against rent loss in addition to the other hazards for which insurance is required by Section 5.

**E. "BORROWER'S RIGHT TO REINSTATE" DELETED.** Section 19 is deleted.

**F. BORROWER'S OCCUPANCY.** Unless Lender and Borrower otherwise agree in writing, Section 6 concerning Borrower's occupancy of the Property is deleted.

**G. ASSIGNMENT OF LEASES.** Upon Lender's request after default, Borrower shall assign to Lender all leases of the Property and all security deposits made in connection with leases

MULTISTATE 1-4 FAMILY RIDER—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT         Form 3170 1/01

*(Page 1 of 3 pages)*

1386                    GREATLAND ■
To Order Call: 1-800-530-9393 □ Fax: 616-791-1131

EXHIBIT A

Copy

of the Property. Upon the assignment, Lender shall have the right to modify, extend or terminate the existing leases and to execute new leases, in Lender's sole discretion. As used in this paragraph G, the word "lease" shall mean "sublease" if the Security Instrument is on a leasehold.

**H. ASSIGNMENT OF RENTS; APPOINTMENT OF RECEIVER; LENDER IN POSSESSION.** Borrower absolutely and unconditionally assigns and transfers to Lender all the rents and revenues ("Rents") of the Property, regardless of to whom the Rents of the Property are payable. Borrower authorizes Lender or Lender's agents to collect the Rents, and agrees that each tenant of the Property shall pay the Rents to Lender or Lender's agents. However, Borrower shall receive the Rents until (i) Lender has given Borrower notice of default pursuant to Section 22 of the Security Instrument and (ii) Lender has given notice to the tenant(s) that the Rents are to be paid to Lender or Lender's agent. This assignment of Rents constitutes an absolute assignment and not an assignment for additional security only.

If Lender gives notice of default to Borrower: (i) all Rents received by Borrower shall be held by Borrower as trustee for the benefit of Lender only, to be applied to the sums secured by the Security Instrument; (ii) Lender shall be entitled to collect and receive all of the Rents of the Property; (iii) Borrower agrees that each tenant of the Property shall pay all Rents due and unpaid to Lender or Lender's agents upon Lender's written demand to the tenant; (iv) unless applicable law provides otherwise, all Rents collected by Lender or Lender's agents shall be applied first to the costs of taking control of and managing the Property and collecting the Rents, including, but not limited to, attorney's fees, receiver's fees, premiums on receiver's bonds, repair and maintenance costs, insurance premiums, taxes, assessments and other charges on the Property, and then to the sums secured by the Security Instrument; (v) Lender, Lender's agents or any judicially appointed receiver shall be liable to account for only those Rents actually received; and (vi) Lender shall be entitled to have a receiver appointed to take possession of and manage the Property and collect the Rents and profits derived from the Property without any showing as to the inadequacy of the Property as security.

If the Rents of the Property are not sufficient to cover the costs of taking control of and managing the Property and of collecting the Rents any funds expended by Lender for such purposes shall become indebtedness of Borrower to Lender secured by the Security Instrument pursuant to Section 9.

Borrower represents and warrants that Borrower has not executed any prior assignment of the Rents and has not performed, and will not perform, any act that would prevent Lender from exercising its rights under this paragraph.

Lender, or Lender's agents or a judicially appointed receiver, shall not be required to enter upon, take control of or maintain the Property before or after giving notice of default to Borrower. However, Lender, or Lender's agents or a judicially appointed receiver, may do so at any time when a default occurs. Any application of Rents shall not cure or waive any default or invalidate any other right or remedy of Lender. This assignment of Rents of the Property shall terminate when all the sums secured by the Security Instrument are paid in full.

**I. CROSS-DEFAULT PROVISION.** Borrower's default or breach under any note or agreement in which Lender has an interest shall be a breach under the Security Instrument and Lender may invoke any of the remedies permitted by the Security Instrument.

EXHIBIT A

Copy

BY SIGNING BELOW, Borrower accepts and agrees to the terms and provisions contained in pages 1 through 3 of this 1-4 Family Rider.

_____ (Seal)            _____ (Seal)
JASON ROCKENBACH                 -Borrower                                          -Borrower


_____ (Seal)            _____ (Seal)
                                 -Borrower                                          -Borrower


_____ (Seal)            _____ (Seal)
                                 -Borrower                                          -Borrower


MULTISTATE 1-4 FAMILY RIDER—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT            Form 3170 1/01

*(Page 3 of 3 pages)*            1386   GREATLAND ■
                                To Order Call: 1-800-530-9393 □ Fax: 616-791-1131

EXHIBIT A

Copy

# PREPAYMENT RIDER

This Prepayment Rider is made this          28th          day of          March 2007          .
and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust or the
Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure
Borrower's Note (the "Note") to
FIRST FRANKLIN FINANCIAL CORP., AN OP. SUB. OF MLB&T CO., FSB
(the "Lender") of the same date and covering the property described in the Security Instrument and located at:

1004 E IDA ST
TAMPA, FL 33603

**ADDITIONAL COVENANTS.** In addition to the covenants and agreements made in the Security
instrument, Borrower and Lender further covenant and agree as follows:

Borrower can make a partial prepayment at anytime without paying any charge. Borrower may make a
full prepayment at any time subject to a prepayment charge as follows:

If within the first     12     months after the date Borrower executes the Note, Borrower makes a full
prepayment (including prepayments occurring as a result of the acceleration of the maturity of the Note),
Borrower must, as a condition precedent to a full prepayment, pay a prepayment charge on any amount prepaid
in any 12 month period in excess of 20% of the unpaid balance. The prepayment charge will equal the interest
that would accrue during a six-month period on the Excess Principal calculated at the rate of interest in effect
under the terms of the Note at the time of the full prepayment.

**NOTICE TO BORROWER**

**Do not sign this loan agreement before you read it. This loan agreement provides for the payment of a
penalty if you wish to repay the loan prior to the date provided for repayment in the loan agreement.**

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this
Prepayment Rider.

_____(Seal)          _____(Seal)
JASON ROCKENBACH                         -Borrower                                           -Borrower

_____(Seal)          _____(Seal)
                                                         -Borrower                                           -Borrower

_____(Seal)          _____(Seal)
                                                         -Borrower                                           -Borrower

Adjustable Rate Prepayment Rider - First Lien – AK, AL, AZ, CA, CO, CT, DC, DE, FL, GA, HI, IA, ID, KS, LA, MA, MD, MN,
MT, ND, NE, NH, NJ, NM, NV, NY, OK, OR, PA, RI, SC, SD, TN, TX, UT, VA, VT, WA, WY

1386

EXHIBIT A

Copy

# ADJUSTABLE RATE AND BALLOON RIDER

(Index: Six-Month London Interbank Offered Rate ("LIBOR") As Published in *The Wall St. Journal* – Rate Caps)
(Amortization Period:    Fifty    Years)
(Assumable)
(Not to be Used for Texas Homestead Loans Unless Proceeds Used Only for Purchase Money or Refinance of Purchase Money)

This Adjustable Rate and Balloon Rider is made this   28th   day of    March 2007    and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure Borrower's Adjustable Rate Note as amended and supplemented by the Addenda including the Balloon Note Addendum to Adjustable Rate Note (collectively the "Note") to
FIRST FRANKLIN FINANCIAL CORP., AN OP. SUB. OF MLB&T CO., FSB
(the "Lender") of the same date and covering the property described in the Security Instrument and located at:
1004 E IDA ST
TAMPA, FL 33603
[Property Address]

THE NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN THE INTEREST RATE AND THE MONTHLY PAYMENT. THE NOTE LIMITS THE AMOUNT BORROWER'S INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE BORROWER MUST PAY.

THIS LOAN IS PAYABLE IN FULL ON THE MATURITY DATE SET FORTH IN THE SECURITY INSTRUMENT. THE BORROWER MUST REPAY THE ENTIRE PRINCIPAL BALANCE OF THE LOAN, UNPAID INTEREST AND OTHER SUMS THEN DUE. THE LENDER IS UNDER NO OBLIGATION TO REFINANCE THE LOAN AT THAT TIME. THE BORROWER WILL, THEREFORE, BE REQUIRED TO MAKE PAYMENT OUT OF OTHER ASSETS THAT THE BORROWER MAY OWN, OR THE BORROWER WILL HAVE TO FIND A LENDER, WHICH MAY BE THE LENDER THE BORROWER HAS THIS LOAN WITH, WILLING TO LEND THE BORROWER THE MONEY. IF THE BORROWER REFINANCES THIS LOAN AT MATURITY, THE BORROWER MAY HAVE TO PAY SOME OR ALL OF THE CLOSING COSTS NORMALLY ASSOCIATED WITH A NEW LOAN EVEN IF THE BORROWER OBTAINS REFINANCING FROM THE SAME LENDER.

ADDITIONAL COVENANTS. In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

A.    INTEREST RATE AND MONTHLY PAYMENT CHANGES
The Note provides for an initial interest rate of   8.6500 %. The Note provides for changes in the interest rate and the monthly payments as follows:

4.    INTEREST RATE AND MONTHLY PAYMENT CHANGES
(A)    Change Dates
The interest rate I will pay may change on the first day of    April 2009    , and may change on that day every  6th   month thereafter. Each date on which my interest rate could change is called a "Change Date."

(B)    The Index
Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is the six month London Interbank Offered Rate ("LIBOR") which is the average of interbank offered rates for six-month U.S. dollar-denominated deposits in the London market, as published in *The Wall Street Journal*. The most recent Index figure available as of the first business day of the month immediately preceding the month in which the Change Date occurs is called the "Current Index."

Page 1 of 3               1386       6 Month LIBOR Adjustable Rate and Balloon Rider – Multistate Form



EXHIBIT A

Copy

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

**(C)    Calculation of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding Five and Nine Tenths
percentage point(s) (    5.9000%) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full    Fifty    ( 50 ) years after the date of the Note at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment. I will pay the remaining unpaid principal balance on the Maturity Date.

**(D)    Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than    11.6500% or less than    8.6500%. Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than    One    percentage points (1.0000  %) from the rate of interest I have been paying for the preceding six months. My interest rate will never be greater than    14.6500    % nor less than    8.6500%.

**(E)    Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first payment date after the Change Date until the amount of my monthly payment changes again.

**(F)    Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**B.    TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER**

Section 18 of the Security Instrument is amended to read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.**  As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

Page 2 of 3    386
6 Month LIBOR Adjustable Rate and Balloon Rider   Multistate Form

EXHIBIT A

Copy

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign as assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under this Note and Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Adjustable Rate and Balloon Rider.

_____ (Seal)          _____ (Seal)
JASON ROCKENBACH          -Borrower                                      -Borrower

_____ (Seal)          _____ (Seal)
                          -Borrower                                      -Borrower

_____ (Seal)          _____ (Seal)
                          -Borrower                                      -Borrower

[*Sign Original Only*]

1386
                                                       6 Month LIBOR Adjustable Rate and Balloon Rider – Multistate Form

EXHIBIT A

Copy

 

Legal Description:

THE SOUTH 90 FEET OF LOT 14, PIERCE SUBDIVISION, AS PER PLAT THEREOF, RECORDED IN PLAT BOOK 9, PAGE 70, OF THE PUBLIC RECORDS OF HILLSBOROUGH COUNTY, FLORIDA.

FORM HP004

EXHIBIT A



Bob Henriquez
**Hillsborough County Property Appraiser**

https://www.hcpafl.org/
15th Floor County Ctr.
601 E. Kennedy Blvd, Tampa, Florida 33602-4932
Ph: (813) 272-6100

# Folio: 172338-0000



## Owner Information

| | |
|---|---|
| Owner Name | ROCKENBACH JASON |
| Mailing Address | 10005 REMINGTON DR<br>RIVERVIEW, FL  33578-8344 |
| Site Address | 1004 E IDA ST, TAMPA |
| PIN | A-06-29-19-4LN-000000-00014.0 |
| Folio | 172338-0000 |
| Prior PIN | |
| Prior Folio | 000000-0000 |
| Tax District | TA - TAMPA |
| Property Use | 0100 SINGLE FAMILY R |
| Plat Book/Page | 9/70 |
| Neighborhood | 205005.00 | SE Seminole Heights Area |
| Subdivision | 4LN | PIERCE SUBDIVISION |

## Value Summary

| Taxing District | Market Value | Assessed Value | Exemptions | Taxable Value |
|---|---|---|---|---|
| County | $84,800 | $64,156 | $0 | $64,156 |
| Public Schools | $84,800 | $84,800 | $0 | $84,800 |
| Municipal | $84,800 | $64,156 | $0 | $64,156 |
| Other Districts | $84,800 | $64,156 | $0 | $64,156 |

Note: This section shows Market Value, Assessed Value, Exemptions, and Taxable Value for taxing districts. Because of changes in Florida Law, it is possible to have different assessed and taxable values on the same property. For example, the additional $25,000 Homestead Exemption and the non-homestead CAP do not apply to public schools, and the Low Income Senior Exemption only applies to countywide and certain municipal millages.

## Sales Information

| Book | Page | Month | Year | Type Inst | Qualified or Unqualified | Vacant or Improved | Price |
|---|---|---|---|---|---|---|---|
| 16948 | 0021 | 08 | 2006 | WD | Qualified | Improved | $127,000 |

EXHIBIT B

## Building Information

### Building 1

| | |
|---|---|
| **Type** | 01  \| SINGLE FAMILY |
| **Year Built** | 1925 |



### Building 1 Construction Details

| Element | Code | Construction Detail |
|---|---|---|
| Class | D | Wood Frame |
| Exterior Wall | 4 | Wood/Masonry Siding |
| Roof Structure | 3 | Gable or Hip |
| Roof Cover | 3 | Asphalt/Comp. Shingle |
| Interior Walls | 5 | Drywall |
| Interior Flooring | 8 | Carpet |
| Heat/AC | 2 | Central |
| Architectural Style | 6 | Pre-1940 1-Story |
| Condition | 3 | Average |
| Bedrooms | 2.0 | |
| Bathrooms | 1.0 | |
| Stories | 1.0 | |
| Units | 1.0 | |

### Building 1 subarea

| Area Type | Gross Area | Heated Area | Depreciated Value |
|---|---|---|---|
| BAS | 94 | 94 | $4,839 |
| BAS | 1,044 | 1,044 | $53,740 |
| FSP | 192 | | $2,986 |
| **Totals** | **1,330** | **1,138** | **$61,565** |

## Extra Features

| OB/XF Code | Description | Building | Year On Roll | Length | Width | Units | Value |
|---|---|---|---|---|---|---|---|
| 0651 | SHED NOT PERMANENTLY AFFIXED | 0 | 2017 | 0 | 0 | 1.00 | $0 |
| 0595 | FIREPLACE | 1 | 1997 | 0 | 0 | 1.00 | $2,486 |

## Land Information - Total Acreage: 0.10

| Use Code | Description | Zone | Front | Depth | Land Type | Total Land Units | Land Value |
|---|---|---|---|---|---|---|---|
| REDF | Res SF Class 4.35 | SH-RM | 50.00 | 90.00 | SE \| SF LOTS W/ EFF SIZE | 4,500.00 | $20,750 |

## Legal Description

PIERCE SUBDIVISION S 90 FT OF LOT 14

EXHIBIT B